UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

**FILED**
SEP 1 1 2009
CLERK

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| THE FIRST NATIONAL BANK IN | \* | CIV. 06-4101 |
| SIOUX FALLS, a national banking corporation, | \* | |
| | \* | AMENDED COURT TRIAL |
| Plaintiff, | \* | MEMORANDUM OPINION |
| | \* | AND ORDER |
| vs. | \* | |
| | \* | |
| FIRST NATIONAL BANK SOUTH | \* | |
| DAKOTA, SPC, INC. d/b/a FIRST | \* | |
| NATIONAL MERCHANT SOLUTIONS, | \* | |
| FIRST NATIONAL BANK OF OMAHA, | \* | |
| and FIRST NATIONAL OF NEBRASKA, INC., | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*]

A court trial was held on the Second Amended Complaint (Doc. 61) of the Plaintiff The First National Bank in Sioux Falls (FNB Sioux Falls). In this Second Amended Complaint FNB Sioux Falls has sought relief for alleged violations of the Lanham Act, common law service mark infringement, and common law unfair competition, as well as for the alleged violation of a preliminary injunction previously issued by this Court in *The First National Bank In Sioux Falls v. First National Bank South Dakota,* No. 95-4116 (D.S.D. April 14, 1997).[1] In its March 31, 2008 Memorandum Opinion, this Court, after considering the changes of location, advertising and promotional activities of the parties in the cases at hand and the factors of § 24 of The Restatement (Second) of Judgments, rejected the Defendants' argument that res judicata barred FNB's Sioux Falls' claims in the case now before the Court.[2]

[1]This decision was affirmed in *First Nat'l Bank, In Sioux Falls v. First Nat'l Bank, South Dakota,* 153 F.3d 885 (8th Cir. 1998).

[2] The motion of Defendants First National Bank South Dakota (FNB South Dakota), SPC, Inc. (SPC) and First National Bank Of Omaha (FNBO), for partial summary judgment on all claims against FNB South Dakota and SPC and on all claims except claims of trademark infringement against FNBO (Doc. 74), was denied except for FNB Sioux Falls' claim for

## FACTUAL FINDINGS AND PROCEDURAL BACKGROUND

Plaintiff, The First National Bank in Sioux Falls

Plaintiff, The First National Bank in Sioux Falls (FNB Sioux Falls), is a nationally chartered bank with its principal offices in Sioux Falls, South Dakota which offers retail and commercial banking services. FNB Sioux Falls, which has also been known as the "Baker Bank," was originally chartered as Minnehaha National Bank of Sioux Falls in 1885. William Lafayette Baker became an owner and president of the bank around 1910. After surviving the Great Depression and the Bank Holiday, Minnehaha National Bank changed its name to First National Bank & Trust Company. In 1952 the name was then changed to The First National Bank in Sioux Falls.[3] In around 1976, FNB Sioux Falls razed its predecessor building and built its current main office on the corner of 9th Street and Phillips Avenue in downtown Sioux Falls. At about that time FNB Sioux Falls adopted the red "Flying F's logo," F's in a pentagonal shape, which is often used in connection with its mark "First National Bank."

The sign on the main office building is "First National Bank." This sign, added at the top of the bank building in the 1980's, is in copper metallic letters. Additional Branches using the term "First National Bank" exist in Minnehaha, Lincoln and Moody Counties in Sioux Falls, Brandon, Baltic, Dell Rapids, Harrisburg and Flandreau. The Farmer's State Bank, Flandreau, was acquired by FNB Sioux Falls' holding company in 1981. The name of that Bank was renamed the Flandreau Branch of First National Bank in Sioux Falls on April 1, 2007. FNB Sioux Falls has consistently used its marks to promote its services in connection with television, radio, billboard and and print media in Minnehaha, Lincoln and Moody Counties. A plethora of news articles, advertisements, acknowledgments and announcements displaying the "Flying F's logo" and the mark, "First National Bank," and "First National" were received into evidence at trial. FNB Sioux Falls has spent approximately a half million dollars in advertising for each of the last ten years preceding the trial

dilution. FNB Sioux Falls conceded that amendments to the Federal Trademark Law Dilution Revision Act clearly establish that a claim for dilution cannot be maintained unless the plaintiff's trademark is "nationally famous,"and that these changes to that law precluded its dilution claim.

[3] For a period between 1976 to 1985 FNB Sioux Falls used the name "First Sioux Falls." *See First Nat'l Bank, In Sioux Falls v. First Nat'l Bank, South Dakota*, 153 F.3d at 887.

2

of this action.

FNB Sioux Falls has a Certificate of Registration for the Service Mark, "THE FIRST NATIONAL BANK IN SIOUX FALLS," which was issued by United States Patent and Trademark Office on March 25, 1997. In this Court's decision in 1997 this Court concluded that "First National," "First National Bank," and "The First National Bank in Sioux Falls" were descriptive marks, that these marks had attained secondary meaning to consumers in the Sioux Falls market area, and that FNB Sioux Falls possessed common law service marks in these marks within a ten-mile radius of its main office at the corner of 9th Street and Phillips Avenue in downtown Sioux Falls.

William Ludlow Baker, the great grandson of William Lafayette Baker was elected President and Chief Executive Officer of FNB Sioux Falls in 2001 and at the time of the trial was also the Chairman of FNB Sioux Falls. Baker testified that FNB Sioux Falls had substantial growth in the past twelve years. FNB Sioux Falls which had assets of around $500 million at the time of the earlier trial now has assets of over a billion dollars, its loans and deposits have about doubled and it now has 20 locations in Minnehaha, Lincoln, and Moody Counties. FNB Sioux Falls receives a majority, approximately 2/3 of its revenue and loan volume, from business and commercial entities. In Baker's estimate, FNB Sioux Falls competes with FNB South Dakota for business and commercial banking services. Baker does not see a distinction between the market FNB Sioux Falls services and the market FNB South Dakota claims to be approaching. Baker classifies both banks as full service banks. At the time of the 2008 trial Baker and Stephanie Gongopoulos, Vice President and Marketing Director of FNB Sioux Falls, testified that other than the Defendants, FNB Sioux Falls was the only bank operating under "First National" and "First National Bank" in Minnehaha, Lincoln, and Moody Counties.[4]

FNB Sioux Falls provides retail merchant services under the name First National Bank Merchant Services. Retail merchant services are offered to business enterprises that accept payment from plastic credit or debit cards. However, FNB Sioux Falls out sources the processing of these transactions through a contractual arrangement with a vendor in Colorado that authorizes and settles payments electronically with the credit and debit card issuing companies. FNB Sioux Falls manages

---

[4]Although a First National Bank of Garretson had previously existed, after the first trial this bank in Garretson was acquired by another bank and now operates under another name.

3

the relationship with the local retail merchants. FNB Sioux Falls' merchant services produces an annual $150,000 net income and does no television or radio advertising.

FNB Sioux Falls takes part in numerous community affairs, such as the display of Christmas trees, and has been a substantial contributor to the Sioux Empire United Way and a community supporter of other sports, civic, educational and cultural events and organizations such as the South Dakota Symphony and the President's Bowl in Sioux Falls. The employees of FNB Sioux Falls are encouraged to volunteer in the community and are given 8 hours of paid time annually for such volunteer work.

Defendants

Defendant First National Bank South Dakota (FNB South Dakota), is a nationally charted bank with its principal offices in Yankton, South Dakota. FNB South Dakota offers full-service banking in Yankton, Huron, Mitchell and Woonsocket, South Dakota. These towns are in Yankton, Beadle, Hanson and Sanborn Counties, respectively. The First National Bank in Yankton previously operated under the name "Valley Bank." The banks in Huron, Mitchell and Woonsocket previously operated under the name "Commercial Bank,"but since about 1999 when they were acquired by FNB South Dakota from Commercial Bank & Trust, they have operated under the service mark "First National Bank South Dakota." FNB South Dakota uses a circle 1 logo with green coloration. In 2000, FNB South Dakota established a processing center at North Potsdam in Northeast Sioux Falls. FNB South Dakota has operated its automobile finance operation from this location since 2000.

Defendant First National Bank of Omaha (FNB Omaha) is a nationally chartered bank with its principal offices in Omaha, Nebraska. Its service mark of the circle 1 logo and "First National Bank" over "Omaha" was registered with the United States Patent and Trademark office on June 22, 2004. Ex. 542.

Defendant SPC, Inc. (SPC) is a Nebraska corporation with its principal offices in Omaha, Nebraska. Since 2002, SPC has done business under the name "First National Merchant Solutions." Defendant First National Merchant Solutions is a wholly owned subsidiary of FNBO. Defendant First National Merchant Solutions offers credit and debit card transaction processing services to merchants throughout the United States including Southeastern South Dakota. In December of 2003,

4

SPC obtained a United States trademark registration for the word mark, FIRST NATIONAL MERCHANT SOLUTIONS. In 2003 it also celebrated its 50th year of processing payments. First National Merchant Solutions is a nationwide processor of credit card and debit card transactions that competes with large national banks and derives less than one percent of its revenue from the Sioux Falls market.

Defendants FNB South Dakota, FNB Omaha, and SPC are all subsidiary organizations of Defendant First National of Nebraska, Inc, (FNNI), a bank holding company with its principal offices located in Omaha, Nebraska, and owned by the Lauritzen family. FNNI is one of the largest commercial bank lenders in the nation and holds over $20 billion in managed assets. During the trial in this matter, the Court allowed FNNI to be added as a party.

Previous Acton

In 1994, FNB South Dakota advertised in the Yankton newspaper, the *Yankton Press and Dakotan*, and on Yankton radio stations referring to FNBSD as "First National Bank." In April and May of 1995, FNB South Dakota ran a newspaper advertisement on several different occasions in the Sioux Falls Argus Leader promoting a certificate of deposit with a 7.14 percent annual yield. In June of 1995, FNB Sioux Falls filed CIV. 95-4116 against FNB South Dakota in this Court alleging that FNB South Dakota had infringed upon its common law rights in the service marks "First National," "First National Bank," and "First National Bank in Sioux Falls."

In a Memorandum Opinion and Order dated April 14, 1997, this Court permanently enjoined FNB South Dakota "from using in any manner or fashion whatsoever, within a ten-mile radius of the main offices of the plaintiff, The First National Bank of Sioux Falls, located at the corner of 9th Street and Phillips Avenue in downtown Sioux Falls, South Dakota, the service marks 'First National,' 'First National Bank,' and 'The First National Bank in Sioux Falls,' or any other name, mark, or designation confusingly similar to plaintiff's three marks." This Court denied a permanent injunction that would have enjoined FNB South Dakota "from using its full name, 'First National Bank South Dakota,' within a ten-mile radius of the main office of [FNB Sioux Falls]." This Court in its 1997 decision reasoned that if FNB South Dakota used its "full legal name ['First National Bank South Dakota'] in conjunction with its 'circle-1' logo in graphic representation" FNB Sioux Falls could not show by a preponderance of the evidence that there would be a likelihood of

confusion among an appreciable number of ordinary consumers regarding the source of or association between the two banks. The Eighth Circuit Court of Appeals affirmed this decision. *See First Nat'l Bank, In Sioux Falls v. First Nat'l Bank, South Dakota*, 153 F.3d 885 (8th Cir. 1998).

## Events after First Litigation

At the time of the first litigation between the parties in this Court FNB South Dakota had communicated its intention to open a branch at the corner of 57th Street and Cliff Avenue in Sioux Falls. However, it is undisputed that no branch was ever opened by FNB South Dakota at this location, and the land that it had purchased at this location was subsequently sold.

In 1998 FNB South Dakota established a loan processing center near 27th and Marion Road in Sioux Falls and placed a mortgage lender in Sioux Falls. In 2000, FNB South Dakota moved its processing center to North Potsdam in the industrial Northeast part of Sioux Falls. FNB South Dakota has also operated its automobile finance operation from this location since 2000. The sign in front of this building displays the circle 1 logo and "First National Bank"over smaller "South Dakota" white lettering on a green background. This processing center is located about .4 of a mile from the Benson Road location of FNB Sioux Falls. In 1999 FNB South Dakota acquired banks in Huron, Mitchell and Woonsocket which previously operated under the name "Commercial Bank." Since1999 they have operated under the service mark "First National Bank South Dakota."

For some time after FNB South Dakota's automobile finance operation at North Potsdam was in operation, misdirected payments with loan coupons from Defendants' loan processing customers were received by FNB Sioux Falls in its mail, night drops and lobbies. FNB Sioux Falls forwarded these misdirected payments to FNB South Dakota or returned them to the Postal Service. These loan coupons designated FNB South Dakota as follows:

> FIRST NATIONAL BANK
> SOUTH DAKOTA
> P O BOX 85130
> SIOUX FALLS SD 57118-8130

The Court views the "SOUTH DAKOTA" on the coupons as resembling more of an address than part of FNB South Dakota's name. The coupon book covers were later modified to include the circle 1 logo before "First National Bank" with the words "South Dakota" in smaller type beneath "First National Bank." The coupons themselves list the bank as "FIRST NATIONAL BANK SD." Ex.

6

670.

Mike Mahlendorf, Senior Vice President of FNNI, came to Sioux Falls in 2005 to determine the feasibility of establishing a branch in Sioux Falls. In July 2005, FNB South Dakota applied with the Office of the Comptroller of the Currency for a branch to be located at 100 South Dakota Avenue, a location which is two blocks from the main office of FNB Sioux Falls. FNB South Dakota received permission from the Comptroller of the Currency to establish at its Sioux Falls Dakota Avenue site a staffed branch bank with no exclusions. It is chartered to offer all banking services.

On October 19, 2005, the business section of the Sioux Falls Argus Leader printed an article with the heading, "New bank slated for downtown," and with the subheading, "First National to replace vacated Wells Fargo." The body of the article identified "First National Bank South Dakota, a division of First National of Nebraska Inc. in Omaha" as the purchaser of the historic building at 100 South Dakota Avenue and the former drive up space of the Wells Fargo Bank Over the next couple of months FNB South Dakota changed the lettering of the name First National Bank South Dakota from brass or copper lettering similar to the lettering on FNB Sioux Falls' main office building, to green lettering preceded by the circle 1 logo.

One branding guideline issued by FNNI dictates that the First National signature include individual signatures to represent affiliates and location or business unit names. This branding guideline, however, directs that the "key to maintaining the presence of the First National signature is keeping it separate from other elements." ( Ex. 563). Another document entitled "Written Communication Standards" (Ex. 365) specifically mentions South Dakota locations, and states:

> In South Dakota, we must use the full name of our bank whenever possible. The only acceptable versions are:
> First National Bank South Dakota
> First National Bank SD

A document entitled "Brand Architecture" directs and depicts the use of the signature "First National Bank" with more prominent lettering, with the city or state location under the signature "First National Bank" and in less prominent, smaller lettering "where possible without use of preposition, thus giving a sense of multiple locations."

First National Merchant Solutions is depicted on business cards with "First National" along side the circle 1 with "Merchant Solutions"in smaller lettering below "First National."In its

7

marketing material "FIRST NATIONAL MERCHANT SOLUTIONS" is set forth as the caption and in other sections of the material, but it is also referenced in the materials as "First National" and described as a "wholly owned subsidiary of First National Bank." Ex. 141. This marketing material which has been distributed by Arlie Gill, a sales representative from Defendant First National Merchant Solutions, also states, "First National Bank has been family owned and run for over 138 years - we've never changed our name and remain committed to remaining independent." Ex. 141. The Court finds this "family-owned" reference mimics the advertisement of FNB Sioux Falls.

Exhibit 386 sets forth the font used by FNB South Dakota in its logo in 1997 and the font used in its current logo. The 1997 logo with all lower-case letters and more prominently displayed circle one is least like the FNB Sioux Falls logo, and the current FNB South Dakota logo with the first letter of each word in upper-case lettering and less prominent circle 1 is noticeably more similar to the FNB Sioux Falls logo. In addition, the current logo has "South Dakota" left justified below and in smaller font than "First National Bank," so as to resemble an address.

Tom Everist, President and Chairman of the Board of the Everist Company, long-time resident and business and civic leader in Sioux Falls, has never been a customer of FNB Sioux Falls. Mr. Everist refers to FNB Sioux Falls as First National or First National Bank. When Mr. Everist first saw the FNB South Dakota building at 100 South Dakota Avenue he believed it was an annex to FNB Sioux Falls until told that it was another bank. Dan Kirby, another long-time resident and business and civic leader in Sioux Falls, and former general counsel and executive vice president of Western Surety has never been a customer of FNB Sioux Falls. Mr. Kirby refers to FNB Sioux Falls as the Baker Bank and equates the bank with a tradition of home-owned banking in Sioux Falls with a good reputation in its civic and community involvement and banking business matters. When Mr. Kirby saw the FNB South Dakota building at 100 South Dakota Avenue he believed it was a part of FNB Sioux Falls until he was later told otherwise by William Ludlow Baker.

Liz Lloyd, a Sioux Falls realtor and diplomat for the Sioux Falls Chamber of Commerce, apologized to Stephanie Gongopoulos from FNB Sioux Falls for missing the ribbon cutting ceremony for FNB Sioux Falls. As it turned out the ribbon cutting was for the opening of FNB South Dakota at 100 South Dakota Avenue, but Ms. Loyd was confused by the notice for the ribbon cutting. Ms. Lloyd, who refers to FNB Sioux Falls as the Baker Bank, is not a customer of either

8

FNB Sioux Falls or FNB South Dakota. Gerald Benenga, a long-time Sioux Falls resident, is the President and C.E.O. of the Center for Active Generations in Sioux Falls, and a Sioux Falls City Council member. The Center for Active Generations has received donations from FNB Sioux Falls. In the fall of 2006, Benenga was trying to contact Don Scott, an employee of FNB Sioux Falls, to discuss a trust issue. After consulting the telephone book Benenga mistakenly called FNB South Dakota. The employee of FNB South Dakota who answered the telephone advised Benenga that Don Scott was not employed there and that Benenga had called the wrong bank. When Benenga apologized the FNB South Dakota employee stated that the incorrect dialing happens frequently and is a "great marketing tool."

Vicki LeVene, an administrator of Family Dental Center in Sioux Falls, oversees the banking for Family Dental Center. Since 1981 Family Dental Center has had a relationship with FNB Sioux Falls. Family Dental Center uses First National Bank Merchant Services for credit card processing for its patients who use credit card services to pay for their dental services. In September of 2005 Vicki LeVene received a telephone call to set up an appointment with Arlie Gill, a sales representative from Defendant First National Merchant Solutions, for credit card processing. Vicki LeVene believed that Gill was with FNB Sioux Falls, so she set up an appointment with Gill for October 4, 2005. Since Vicky LeVene had usually dealt with Paula Hoy, an administrative assistant for First National Bank Merchant Services, Vicki LeVene called First National Bank Merchant Services to see why she was to meet with Gill. After Vicki LeVene was advised that Gill did not work for First National Bank Merchant Services, Paula Hoy agreed to and did cancel the appointment Gill had with Vicki LeVene. On October 4, 2005, Gill showed up to meet with Vicki LeVene and was told that the appointment had been cancelled. On June 25, 2007, a customer of Defendant First National Merchant Solutions mistakenly called FNB Merchant Services to add additional services.

In November of 2005, counsel for FNB Sioux Falls wrote Randy Johnson, President of FNB South Dakota, and requested that FNB South Dakota choose an alternative name for the branch it intended opening in Sioux Falls. The letter states that FNB Sioux Falls was "extremely concerned about increased customer confusion and dilution of the service marks that the bank possesses in the ten-mile radius from its main location." The November 2005 correspondence further advised that

9

FNB Sioux Falls intended "to implement a process to collect, as a part of the business records kept in the ordinary course at the bank, information on consumer confusion" regarding FNB South Dakota and FNB Sioux Falls. After consulting with counsel FNB Sioux Falls hired a company, Electric Pulp, to create an internal utility in FNB Sioux Falls' internal website in order for the employees of FNB Sioux Falls to create an electronic business record of alleged instances of confusion. FNB Sioux Falls has maintained this confusion log (Ex. 298) for the time period of December 8, 2005, through March 6, 2008. FNB Sioux Falls contends this log records over 1,400 instances of documented actual confusion by customers of both FNB Sioux Falls and FNB South Dakota, their vendors, and the public.

Exhibit 168, an envelope and promotional material on retirement plans sent by FNB Omaha to William Ludlow Baker in June of 2006 was received into evidence at trial. Ex. 168. The envelope appears to be part of a bulk mailing. The return address on the envelope was designated "First National Bank" behind the circle 1 logo in green print. The first page of the promotional brochure has "First National Bank" behind the circle 1 logo at the top of the first page of the brochure without reference to Omaha. The fourth and last page of the brochure references "First National Bank Retirement Plan Services"over an Omaha address which is printed in smaller font. The retirement plan services referenced in the brochure are also offered by FNB Sioux Falls.

Baker has encountered several instances when FNB Sioux Falls' customers came to FNB Sioux Falls wanting Certificate of Deposits at the rates advertised by FNB South Dakota, and these customers appeared to him to be disappointed and disillusioned when they found FNB Sioux Falls was not offering that rate. Baker testified to knowledge of FNB Sioux Falls' customers intending to secure loans from FNB Sioux Falls, but instead, contacting FNB South Dakota. Likewise, customers intending to do business with FNB South Dakota came to FNB Sioux Falls and displayed frustration. Baker also testified he has concerns that what he views as confusion by the public regarding the identities of FNB Sioux Falls and FNB South Dakota could result in violation of the Gramm-Leach-Bliley Act's requirement to protect the nonpublic personal information of bank customers.[5]

_____

[5]The Gramm-Leach-Bliley Act, Pub.L. 106-102, 113 Stat. 1338, repealed part of the Glass-Steagall Act of 1933, and opened up competition among banks, securities companies and

Russell Dean purchased a vehicle on August 8, 2006, from Amdahl Automotive, Inc., then a Sioux Falls car dealer. Since his brother, Ryan, worked for FNB Sioux Falls, Russell wanted to finance the car through a loan with FNB Sioux Falls. After Russell was approached by Amdahl's finance officer Russell told the finance officer that he wanted to finance through First National Bank in Sioux Falls and that there was a difference between the banks. Although Russell Dean signed three loan documents (Ex. 675) which refer to First National Bank South Dakota, with the last of the three documents setting forth the circle 1 logo, Russell Dean did not realize until later that he had not taken out a loan with FNB Sioux Falls. When he discovered the error he refinanced with FNB Sioux Falls.

In September of 2006, FNB Sioux Falls received a letter from the Governor of South Dakota asking if FNB Sioux Falls would be a $1,000 corporate sponsor of a Christmas tree at the 2006 Christmas at the Capitol in Pierre, South Dakota. FNB Sioux Falls employee, Bert Olson, received the letter which was addressed to First National Bank of SD, but did not notice the incorrect reference to FNB South Dakota. FNB Sioux Falls had been a corporate sponsor in prior years. FNB Sioux Falls donated the $1,000, but credit for the sponsorship was given to FNB South Dakota. Also, FNB South Dakota's name was on the sign on the tree sponsored by FNB Sioux Falls. FNB Sioux Falls employee Bert Olson contacted the Governor's office and advised of the mistake and requested the name on the tree be corrected. In 2007 the Governor's office again wrote Bert Olson requesting that FNB Sioux Falls again provide a $1,000 corporate sponsorship for the 2007 Christmas at the Capitol. The letter was addressed to Bert Olson at First National Bank of South Dakota, as opposed to First National Bank in Sioux Falls. Bert Olson again called the Governor's office to correct the misunderstanding. FNB Sioux Falls contributed the $1,000 and eventually FNB Sioux Falls received credit for the sponsorship of the tree at the 2007 Christmas at the Capitol.

In February of 2007 a branch manager of FNB Sioux Falls dropped off FNB Sioux Falls scholarship applications to the Sioux Falls Christian Schools. The branch manager was then

---

insurance companies. The Gramm-Leach-Bliley Act allowed commercial and investment banks to consolidate. Part of the Act imposed upon financial institutions "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." *See* 15 U.S.C. § 6801.

contacted by the Sioux Falls Christian Schools questioning why he had submitted more scholarship applications. The branch manager had the Sioux Falls Christian Schools telefax him the alleged previously submitted applications and received scholarship applications from FNB South Dakota. See Ex. 328.

## Confusion Log

FNB Sioux Falls offered into evidence and the Court received Exhibit 298, a confusion log that was designed by Electric Pulp, a company from Sioux Falls that builds websites, and that was maintained by FNB Sioux Falls' employees from December of 2005 through early March of 2008. The confusion log records 1,529 instances of alleged confusion by customers and potential customers of both FNB Sioux Falls and FNB South Dakota, as well as confusion from the public and certain vendors providing services to FNB Sioux Falls and FNB South Dakota.

## Survey Evidence

FNB Sioux Falls hired the Mantis Group to conduct a survey to address the likelihood of confusion between FNB South Dakota and FNB Sioux Falls. The Report was received into evidence (Ex. 327) and its author, George Mantis testified at trial. The Mantis study was conducted by telephoning a random sample of households located within a ten-mile radius of FNB Sioux Falls' main office, and asking to speak to the person in the household 18 years of age or older who would have the next birthday. That household member was then asked if he or she currently had accounts, such as checking or savings accounts, a certificate of deposit, mortgage or loan at any financial institution. The interview was terminated if the household member had no account. Otherwise the interviewer determined which individual was personally involved in deciding with which bank or provider of financial services the accounts were held, and the interviewer then administered the questionnaire to that individual.

The questionnaire in the Mantis Survey was administered to a test group and a control group. The test group was questioned regarding an advertisement sponsored by FNB South Dakota, which included its full name and circle 1 logo. The control group was questioned regarding an advertisement sponsored by the First Bank & Trust, a member of the Fishback Financial Corporation, with branches in Sioux Falls as well as Canton, Brookings, Garretson, Madison, Vermillion and Watertown, South Dakota.. The survey was administered under double-blind

12

conditions.

If a potential respondent agreed to participate in the Mantis study he or she was sent a sealed envelope containing either the test or control envelope and instructed not to open the sealed envelope until recontacted by telephone. When recontacted by telephone, respondents were asked to open their envelope and look at the advertisement as long as they would if reading a newspaper or magazine. When they had looked at the advertisement as long as they wished, they were instructed to place the advertisement back in the envelope and out of sight during questioning. Independent interviewing specialists listened to the interviews. The respondents were then asked some or all of the following questions based on their responses:

> 1. What is the name of the financial institution that sponsored the ad you just saw?
>
> 2a. Why do you say that? 2b. Anything else? 2c. What, if anything, can you tell me about (RESPONSE GIVEN)? 2d. Anything else?
>
> 3. You may have already told me, but where is the sponsor of the ad you just saw located? Please be as specific as possible.
>
> 4. Does the sponsor of the ad you just saw have any other offices or locations?
>
> 5. Where are the other offices located? Again, please be as specific as possible.
>
> 6. Do you thing that the sponsor of the ad you just saw is or is not connected to, authorized by, or affiliated with any other financial institution or institutions?
>
> 7. With which other financial institution or institutions?
>
> 8a-9(d). Why do you say that (INSTITUTION MENTIONED) is connected to, authorized by or affiliated with the sponsor of the ad? Anything else?

Based on the proportion of respondents who gave a confusion response to the control ad, Mr. Mantis estimated survey noise of 2.1%. After excluding members of the test group who "may possibly be confused," Mantis reported total confusion in the test group as 21.1%. After subtracting the survey noise, Mantis reported what he characterized as a conservative measure of confusion of 19%.

13

Defendants hired RL Associates to conduct its survey and Dr. Michael Rappeport authored their report (Ex. 552) and testified at trial. The methodology in the Rappeport survey consisted of one-room in-person interviews at the offices of a Sioux Falls market research company during March and April of 2006. The respondents were recruited and screened over the telephone and paid $25 to drive to the market research company offices to complete a 10-minute double blind survey. The universe of the Rappeport survey consisted of men and women 21 years old or older who lived within ten miles of downtown Sioux Falls who currently were using or were likely to use services offered by a bank in Sioux Falls. The controls used in the Rappeport survey consisted of all respondents seeing the following control names:

> a) Dakotah Bank
>
> b) First Bank and Trust
>
> c) First Dakota National Bank

Half of the respondents saw the additional control name of First National of Nebraska.

The respondents were shown a display of names of test and control banks, and asked whether they perceived any of the banks in the display as being connected to or affiliated with each other. Half of the respondents saw a display with five names in it, and half of the respondents saw a display with an additional sixth name in it. After receiving introductory instructions about not guessing, the respondents were told:

> I am going to show you a series of cards, each with the name of a bank on it. You may or may not be familiar with these banks. After you have had the time to look at the cards, I am going to ask you some questions. Now, please take the time to read each of these cards.

After the respondent indicated he or she was finished looking at the cards, the cards were taken from the respondents and laid out in a line, the interviewer asked:

> 1. Do you think ... any of these banks are connected or affiliated, or, or don't you have an opinion?

The respondents who answered "none of these banks are connected or affiliated," were then asked,

> 2. Why do you think that none of these banks are connected or affiliated?

14

The respondents who answered that they thought "any of these banks are connected or affiliated," were then asked the following two questions:

> 3. Which of these banks do you think are connected or affiliated? PROBE: Are there any others?
> 4. You said you think that banks [INSERT LETTERS] are connected or affiliated. Why do you say that? Please be as specific as possible. PROBE: Is there anything else?

The interviewers then asked all of the respondents:

> 5. Which, if any, of these banks have you ever heard of before?

Regarding each bank chosen in the above question number 5, the respondents were asked:

> 6. What, if anything, can you tell me about [the bank named in response to question number 5]? Please be as specific as possible. PROBE: Is there anything else?

Then all respondents were asked:

> 7. Finally, where do you do your banking?

Dr. Rappeport reviewed the responses and reported 13% confusion. Dr. Rappeport concluded that 13% confusion was not significant evidence of likelihood of trademark confusion. Dr. Rappeport also opined that given the care people show in selecting a bank, even where there is an initial misunderstanding of the connections between banks, people are more likely to correctly identify a bank before creating or expanding a relation as compared to the selection of another product or service.

## ANALYSIS

### Secondary Meaning

In its 1997 decision this Court found that FNB Sioux Falls' marks of "First National," "First National Bank," and "First National Bank in Sioux Falls," were descriptive marks. This Court also found by a preponderance of the evidence in the 1997 decision that FNB Sioux Falls' "Flying F's" logo and service marks had attained secondary meaning to consumers in the Sioux Falls market area. Those findings, which were affirmed on appeal, remain intact. In fact, in their pretrial proposed

15

findings and conclusions, Defendants stated that they "readily concede that [FNB Sioux Falls] owns common law rights to the marks "First National," "First National Bank," and "First National Bank in Sioux Falls," that such marks are descriptive marks which have attained secondary meaning and that [FNB Sioux Falls'] marks have also been found to protectable 'within a ten mile radius of First National Bank in Sioux Falls' main office.'" This Court must now determine whether FNB Sioux Falls correctly maintains that its service marks are entitled to trademark protection in all of Minnehaha, Lincoln and Moody Counties.

"THE FIRST NATIONAL BANK IN SIOUX FALLS" is now a registered mark. However, with regard to its other unregistered descriptive service marks, FNB Sioux Falls, in order to succeed on a claim of false designation of origin under the Lanham Act, must first demonstrate that the service marks have acquired a secondary meaning in the areas in which it seeks trademark protection, and must show that the secondary meaning existed prior to the date on which the Defendants commenced using the same or similar marks. *See Co-Rect Products, Inc. v. Marvy! Adver. Photography*, 780 F.2d 1324,1329 (8th Cir. 1985); *Shoppers Fair of Ark., Inc. v. Sanders Co.*, 328 F.2d 496 (8th Cir. 1964).

Since the time of the first trial (see Ex. 1), FNB Sioux Falls has expanded its customer base both geographically and in number. FNB Sioux Falls has its main office and 13 other location in Sioux Falls. It also has another 6 locations in Dell Rapids, Brandon and Baltic in Minnehaha County, Harrisburg in Lincoln County, and Flandreau in Moody County. Ex. 143, 191. With the exception of Flandreau, all of these locations are within the Sioux Falls Metropolitan area.[6] "First National Bank" with the Flying F's logo has been displayed on the buildings and signs on these locations. Ex. 171. "First National Bank" and the Flying F's logo has also been displayed on print advertisements

---

[6]This Court is taking judicial notice of population growth and geography information presented in Wikipedia *See* http://en.wikipedia.org/wiki/Sioux_Falls,_South_Dakota. Although courts have in some cases taken judicial notice of Wikipedia, *see, e.g., United States v. Bazaldua*, 506 F.3d 671, 673n. 2 (8th Cir. 2007), this Court is relying on this source only to the extent noted because the information noted is not subject to reasonable dispute. *See* FED. R. EVID. 201. In addition to the city of Sioux Falls, other cities and towns included in the Sioux Falls metropolitan area are Brandon, Dell Rapids and all other towns in Minnehaha County, Tea, Harrisburg, Worthing, Lennox, Canton and Beresford in Lincoln County, and Chancellor, Parker, Hurley and Centerville in Turner County. Dell Rapids is 18 miles from FNB Sioux Falls' home office and that same radius encompasses Canton but does not encompass Beresford.

regarding the services rendered at these locations. Ex.173,175,177,180,181, 182, 184, 185,186,187,191, 199. "First National Bank" with the Flying F's logo has ben displayed on billboards in Sioux Falls, Brandon and Dell Rapids. Ex. 240, 243. FNB Sioux Falls has stressed in its advertisements that it has always been locally owned and stated, "First National's focus always has been the Sioux Falls area and always will be." Ex. 225.

The Eighth Circuit has adopted a succinct statement of the requirements to establish a secondary meaning:

> [A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods and services may become so associated in the public mind with such goods or services that it serves to identify them and distinguish them from the goods or services of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor.' (citations) 'A trade-mark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another.' (citations)

*Shoppers Fair of Ark., Inc. v. Sanders Co.*, 328 F.2d at 499 (quoting *Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas*, 185 F.Supp. 895, 903 (E.D.Ark. 1960)); *First Federal Savings and Loan Ass'n of Council Bluffs v. First Federal Savings and Loan Ass'n of Lincoln*, 929 F.2d 382 (8th Cir. 1991) (the term "First Federal" as used in a savings and loan association's service mark had acquired sufficient secondary meaning to be protectable in county in which association did business).

In 1979 FNB Sioux Falls purchased its branch in Dell Rapids which is 18 miles from FNB Sioux Falls' main office and near the Northern edge of Minnehaha County. The evidence in this case supports a finding that FNB Sioux Falls has established secondary meaning in its marks in all of Minnehaha County. The growth of FNB Sioux Falls' customer base and the corresponding growth of the Sioux Falls metropolitan area into Lincoln County[7] as well as the other evidence presented at this trial support a finding that FNB Sioux Falls has established secondary meaning in its marks in that part of Lincoln County that is within an 18 miler radius of FNB Sioux Falls' main office.

The acquisition of the Flandreau bank in Moody County occurred substantially later than the period of time in which the existence and exclusive use of the service marks in Minnehaha and part

---

[7] By one estimate, Lincoln County is the ninth-fastest growing county (by percentage) in the United States. *See* http://en.wikipedia.org/wiki/Sioux_Falls,_South_Dakota.

of Lincoln County had been established. The Flandreau branch, which is around 35 miles from the main branch, is located a substantial distance further from the main office than FNB Sioux Falls' other branches. FNB Sioux Falls has no doubt used its mark in advertising which reached and even targeted the Moody County area (Ex. 182).However, "[a]lthough it is true that advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent." *Co-Rect Products, Inc. v. Marvy! Advertising*, 780 F.2d 1324, 1332 (8th Cir.1985). FNB Sioux Falls has not demonstrated the effect of its advertising in Moody County. In addition, this Court notes that when a representative of FNB South Dakota bank shopped in Flandreau on June 28, 2006, the association with FNB Sioux was less than clear. A business card with the Flying F logo but also with "Farmers State Bank" on it was given to bank customers. *See* Ex. 368. This Court finds that FNB Sioux Falls has not presented sufficient evidence of secondary meaning of its service marks in Moody County so as to be entitled to protection of its service marks in this area.

## WHETHER FNB SIOUX FALLS IS ENTITLED TO RELIEF FOR SERVICE MARK INFRINGMENT AND FALSE DESIGNATION UNDER THE LANHAM ACT IN MINNEHAHA COUNTY AND PART OF LINCOLN COUNTY?

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides in part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

An owner of a mark is entitled to injunctive relief if the use of that mark violates either the prohibition against false designation of origin or the prohibition against false description or

18

representation and causes a likelihood of confusion among consumers.[8]*Co-Rect Products, Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d at 1329-1330. Minimal market penetration alone is not sufficient to establish infringement of a common-law trademark; rather, such market penetration must be significant enough to pose a real likelihood of confusion among consumers in the area. *Sweetarts v. Sunline, Inc.*, 436 F.2d 705 (8th Cir. 1971). To successfully establish service mark infringement under the common law and the Lanham Act FNB Sioux Falls bears the burden of proving that FNB South Dakota "would create a likelihood of confusion deception, or mistake among an appreciable number of ordinary consumers as to the source of or association between the banks' services." *First Nat'l Bank, In Sioux Falls v. First Nat'l Bank, South Dakota*, 153 F.3d 885, 888 (8th Cir. 1998).

To determine whether a likelihood of confusion exists, this Court must consider the following factors: 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendants' marks; 3) the degree to which the allegedly infringing services compete with the plaintiff's services; 4) the alleged infringers' intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion. *See SquirtCo v. The Seven-Up Co.,* 628 F.2d 1086 (1980); *see also, Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1096 (8th Cir.1996); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 774 (8th Cir.1994). The ultimate determination of likelihood of confusion is not to be mechanically determined through a rigid application of these factors, but since the inquiry is case-specific, different factors may be accorded more weight in different cases. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005).

## 1.The Strength of the Plaintiff's Service or Trademark

Defendants continue to maintain that the terms "First National " and "First National Bank" are exceedingly weak and the fact that numerous financial institutions have registered trademarks with the United States Patent and Trademark Office which incorporate the words "First National "

---

[8] If the use of that mark by another violates either prohibition and causes actual confusion, the owner is entitled to damages . *Warner Brothers v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir.1981). Although in its Second Amended Complaint FNB Sioux Falls requested "compensatory damages for injuries sustained," in its postrial initial and reply briefs FNB Sioux Falls requests only injunctive relief and attorney fees.

19

and and "First National Bank" demonstrates the inherent weakness of FNB Sioux Falls' marks. See Ex. 576-650. Defendants also point out that in FNB South Dakota's 2007 business plan, ten of the twenty-two financial institutions listed as "Sioux Falls Competitors," employ the words FIRST and NATIONAL or a variation thereof. *See* Ex. 523. Thus, Defendants maintain that these marks are entitled to an extremely limited scope of protection. This Court in its 1997 Memorandum Opinion and 2008 summary judgment opinion rejected similar arguments, relying on *First Federal Savings and Loan Ass'n of Council Bluffs v. First Federal Savings and Loan Ass'n. of Lincoln*, 929 F.2d 382, 383-84 (8th Cir. 1991)( The term "First Federal" in a savings and loan association's service mark had acquired sufficient secondary meaning to be protectable in the county in which it did business when it and its competitor were located within one block of each other).*See also, Community State Bank, Nat'l Ass'n v. Community State Bank*, 758 N.W.2d 520, 526 (Iowa 2008)("Community State Bank" had acquired secondary meaning entitling it to trademark protection, even though local competitor began using the same name two months earlier, where bank had used name continuously and exclusively for twelve years.)This Court again rejects Defendants' arguments and finds FNB Sioux Falls' marks to be strong marks in Minnehaha County and the portion of Lincoln County which is within an eighteen-mile radius of First National Bank in Sioux Falls' main office, based on the testimony of area residents, the actual presence of branches in these areas and the history of advertising and signage in these areas. The strength of the mark factor weighs heavily in favor of FNB Sioux Falls.

## 2. The Similarity Between the Plaintiff's and Defendants' Marks

"First National Bank" and "First National," both of which were used by Defendants are identical to FNB Sioux Falls' protected marks. Had the Defendants used their full names with all segments attached and in the same size and style of print, the problems created by the similarities in their marks could have been at least diminished. However, Defendants in this case did not exercise such caution and this factor favors FNB Sioux Falls.

## 3. The Degree to Which the Parties' Services Compete

Defendants characterize FNB Sioux Falls as a full service bank that offers a full array of banking services to consumers in Sioux Falls and the surrounding communities, and characterize FNB South Dakota's branch located at 100 South Dakota Avenue as a commercial banking

20

operation. However, FNB South Dakota has offered a full array of banking services and in a 2006 Strategic Planning Meeting, it characterized its initial strategy as focusing on business banking relationships and then evolving into a full service bank with retail (2 downtown locations and an ATM) trust, investments and mortgage services. Ex. 370. Also, FNB South Dakota's advertisements convey a message that it provides services well beyond the scope of the commercial lending market. *See* Ex. 392, 393. FNB Omaha offers retirement services that are also offered by FNB Sioux Falls. FNB Sioux Falls and Defendants compete in the same markets regardless of Defendants' stated intent to focus on commercial banking and regardless of First National Merchant Solutions' much larger retail merchant services operation. An appreciable number of customers are still likely to be confused by the similar marks. The factor of the degree to which the parties compete weighs in favor of FNB Sioux Falls.

In addition, the "law recognizes that injury from confusion can be caused, not just by loss of sales, but also by damage to reputation and good will. Damage to reputation and good will can be triggered by confusion among non-purchasers." 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:5 (4th Ed. 2007).Confusion, not competition, is the considered the touchstone of trade or service mark infringement. *See Mutual of Omaha Insur. Co.v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987)(citing *SquirtCo*, 628 F.2d at 1091). Over many years FNB Sioux Falls has built an exceptionally good reputation and generated good will by its community involvement and manner of conducting business. FNB Sioux Falls is impacted when it fails to receive recognition for its good works or when customers as well as non-customers suffer inconvenience or disappointment caused by confusion between the banks.

4.The Alleged Infringer's Intent to Confuse

In this Court's 1997 memorandum opinion, this Court made the following findings on the intent to confuse factor:

> Plaintiff did not present direct evidence of defendant's intent to confuse consumers about the origin of banking products and services, but it can be inferred circumstantially that defendant intended, at the least, to target current customers of the plaintiff bank when it ran its advertisement in the Sioux Falls Argus Leader in April and May of 1995. In a marketplace saturated with advertisements by plaintiff proclaiming that, "Behind Every Success, You'll Usually Find A Long-Term Commitment," defendant's advertisement for a

21

higher interest rate CD responded: "This May Be Just The Kind Of Commitment You've Been Looking For." Defendant's play on the word "commitment" could be understood as an attempt to attract the attention of those Sioux Falls consumers who were customers of, or who were familiar with, the plaintiff bank. Defendant did not use the word "commitment" in any of the advertisements it ran in Yankton.

The inferences regarding Defendants' intent that can be drawn from the evidence presented at the 2008 trial are of greater concern to the Court than they were after the first trial. A permanent injunction has been and is still in effect regarding the use of "First National" and "First National Bank" within a ten-mile radius of the main offices of FNB Sioux Falls. In spite of this injunction, Defendants' "Written Communication Standards" (Ex. 365) state,"In South Dakota, we must use the full name of our bank *whenever possible*." (Emphasis added). All of the Defendants in this case were undeniably aware of FNB Sioux Falls' marks and bound by this Court's permanent injunction.[9] Yet in June of 2006 FNB Omaha sent to William Ludlow Baker, and what appears to be others in a bulk mailing, an envelope and promotional brochure with "First National Bank," not "First National Bank Omaha," printed on them. Ex. 168.

The current FNB South Dakota logo with the first letter of each word in upper-case lettering and the less prominent circle 1 is noticeably more similar to the FNB Sioux Falls logo than the logo FNB South Dakota was using at the time of the first trial. *See* Ex. 386. The printed material which does include "South Dakota" with "First National Bank" uses a significantly smaller type and places "South Dakota" below "First National Bank" so that it appears to be an address or location rather than part of the name. The same smaller type and lower placement of "Merchant Solutions" appears in printed material for First National Merchant Solutions. Ex. 141. This marketing material which has

---

[9]FED. R. CIV. P. 65(d)(2) provides that the following who receive actual notice of an injunction by personal service "or otherwise" are bound by the injunction:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in RCFC 65(d)(2)(A) or (B).

been distributed by Arlie Gill in the Sioux Falls area also refers to "First National" and states, "First National Bank has been family owned and run for over 138 years - we've never changed our name and remain committed to remaining independent."Ex. 141. In the early 1980's Valley State Bank was purchased from the Haugo family by FNNI, which was owned primarily by the Lauritzen family. The name of Valley State Bank was not changed to First National Bank South Dakota until 1994. Ex. 157. Even though the statement "First National Bank has been family owned and run for over 138 years - we've never changed our name" is probably true with regard to one or the other of the Defendants, either First National Bank of Omaha or First National of Nebraska, Inc., the statement is not true of First National Bank South Dakota. In addition, by using just "First National," the statement is at the least confusing with The First National Bank in Sioux Falls with its similar history. At the worst, the statement is a deliberate attempt to mislead consumers to think that the claiming bank has the same desirable characteristics as FNB Sioux Falls is known for in the Sioux Falls community, a long-term, family-owned, independent bank in your community. The "in your community" inference comes from improperly using only "First National," contrary to the permanent injunction previously entered by this Court.

It also concerns the Court that when FNB South Dakota first moved to a location two blocks from FNB Sioux Falls' main office it placed on its building copper or some other metallic lettering similar to the lettering on FNB Sioux Falls' main office building. Considering the totality of this evidence, the Court finds some evidence of an intent to confuse consumers about the origin of banking products and services which weighs in favor of FNB Sioux Falls.

### 5. Degree of care reasonably expected of potential customers

In the earlier case before this Court, this Court found and the Eighth Circuit Court of Appeals affirmed the finding that consumers tend to exercise a relatively high degree of care in selecting banking services, and that as a result, bank customers are more likely to notice what, in other contexts, may be relatively minor differences in names. In that earlier case, however, this Court also credited expert testimony that even sophisticated consumers exposed to very similar advertisements may still become confused as to the source of advertisements. *See First Nat'l Bank, In Sioux Falls v. First Nat'l Bank, South Dakota,* 153 F.3d at 888; *see also* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:103 (4th Ed. 2007). The Court further notes that

23

in the trial of this case, Mr. Kirby and Mr. Everist, both sophisticated businessmen, were for some period of time confused about whether FNB South Dakota's bank on Dakota Avenue was a branch of FNB Sioux Falls.

The consumers of merchant services from SPC and FNB Sioux Falls, are as a group more sophisticated business operators who accept payment card transactions from customers. Likewise, the consumers involved in large commercial transaction would be sophisticated consumers of these services. Even if the Court focuses on the less sophisticated consumers of banking services such as checking accounts and savings, which exist in this case, the "degree of care reasonably expected of potential customers" factor favors the Defendants in this case.

## 6. Evidence of Actual Confusion

Although actual confusion is not essential to a finding of trademark infringement, it can be positive proof of likelihood of confusion. *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091(8th Cir. 1980)(citing *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958) ).The reason actual confusion is not required to prove infringement is explained as follows:

> Recognizing that it is very difficult, and often impossible, to obtain reliable evidence of actual confusion of buyers, the courts often make statements to the effect that: "Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition, it being recognized that reliable evidence of actual confusion is practically almost impossible to secure." Similarly, "[t]he law recognizes that random instance of confusion often go unreported or unrecorded." Persons who are truly confused will often never be aware of the deception. Others who were confused and later learned of their deception will often not bother to report the fact. Therefore, it is error for a court to find that plaintiff failed to prove injury caused by actual confusion and conclude that plaintiff has failed to prove a violation of the Lanham Act.

4 J. THOMAS MCCARTHY, § 23:12. In spite of the fact that customers are unaware of or do not report their confusion, the record in this case contains substantial evidence of actual confusion.

## *Confusion Log Evidence*

The Court finds that the confusion log maintained by FNB Sioux Falls' employees, although it has obvious flaws, is evidence of actual confusion. Defendants have continued to maintain that the confusion log is not credible evidence of trademark confusion, but rather is a "poorly designed and self-serving document, designed and implemented by Plaintiff's trial counsel, which was intended

24

to maximize the alleged instances of actual confusion." Doc. 120. Defendants also continue to maintain that the confusion log is inadmissible as double hearsay. Over the objection of Defendants, this Court considered an earlier version of this confusion log in previously deciding the Defendants' motion for partial summary judgment. In considering the confusion log in determining the summary judgment motion the Court concluded that some of the information contained in the confusion log was admissible under the hearsay exception in FED.R.EVID. 803(3)[10] as evidence of then existing state of mind. The Court at that time explained:

> The Court is cognizant of the concerns expressed by the Defendants regarding the nature of the evidence contained in the confusion log and has taken that into consideration in determining how much weight should be given to this evidence. As one commentator has surmised, "The mere fact that out-of-court statement indicating actual confusion may be admissible does not mean that such statements will necessarily establish actual confusion." *See* Mark D. Robbins, *Actual Confusion in Trademark Infringement Litigation: Restraining Subjectivity Through a Factor-Based Approach to Valuing Evidence*, 2 NW. J. TECH. & INTELL. PROP. 1, *100 (Spring, 2004). When weighing the evidence contained in the confusion log as well as other evidence of purported actual confusion, the Court will continue to consider whether the persons purportedly confused are deemed relevant persons, whether the amount of evidence of actual confusion is of a sufficient quantity, the sophistication, intelligence and level of care or attentiveness exercised by such purportedly confused persons, and the potential biases and credibility of such persons.

Doc. 148.

The evidentiary value of the confusion log is stronger after the trial than at the summary judgment stage of this case because at the trial in this matter several employees of FNB Sioux Falls testified as to the events which they had recorded in the confusion log. Although Defendants correctly note that no CD customers were called by FNB Sioux Falls at trial and although Russell Dean was the only loan customer called by FNB Sioux Falls at trial regarding confusion between the parties, the following employee witnesses bolstered the weight given to the confusion log: Stephanie Gongopoulos, Russell Dean, Lori Schoffelman, Lori Gulbrandson, Bert Olson, Daron Van Beek, Jill

---

[10]The Court in its earlier summary judgment opinion rejected FNB Sioux Falls' claim that the confusion log was not hearsay and rejected the argument that the evidence fell under the business record exception of FED. R. EVID. 803(6), because a review of the record demonstrated then as it does now that the confusion log was prepared in anticipation of litigation and not in the ordinary course of business.

Salter, C.O. Powell, Paula Hoy (deposition), Liz Crow, Ricca Bent, Tim Dunn and Sara Zacharias. In addition FNBSD employees testified as to instances of actual confusion and employee Tom Shields conceded that on the morning of his testimony the personal financial statement and tax returns concerning one of FNB South Dakota's business clients had been erroneously sent to FNB Sioux Falls.

Defendants argue that at least 1,392 entries in the confusion log refer to something other than actionable trademark confusion. Even if the Court accepts that figure of 1,392 improperly characterized entries as accurate, there still remains a significant amount of documented confusion. The evidence of actual confusion is more substantial than "vague evidence of misdirected phone calls and mail." *Cf. Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996). Rather, a significant amount of the evidence in the confusion log, along with evidence presented at trial set forth the reasons for the confusion of potential customers and the public and presented evidence that "demonstrate[d] rather than explicitly assert[ed] confusion." *See Rainforest Cafe, Inc. v. Amazon, Inc.*, 86 F.Supp.2d 886, 902 (D.Minn. 1999).

*Survey Evidence*

The Eighth Circuit Court of Appeals considers survey evidence appropriate to demonstrate actual consumer confusion and has stated that such evidence "should be given substantial weight unless seriously flawed." *See Mutual of Omaha Insur. Co. v. Novak*, 836 F.2d at 400-401. Under the majority rule technical deficiencies can reduce a survey's weight, not its admissibility, particularly in a non-jury case. *See* 6 J. THOMAS MCCARTHY,§32:170. If the Court finds that either or both of these surveys is without serious flaw, the survey or surveys are circumstantial evidence of actual and likelihood of confusion to be given whatever weight the Court finds appropriate. 6 J. THOMAS MCCARTHY,§32:184.

Defendants maintain that the Mantis survey presented by FNB Sioux Falls improperly ignored this Court's 1997 Memorandum Opinion by using an improper control. In the 1997 Memorandum Opinion this Court found The First National Bank in Garretson to be an improper control because that bank was a small rural bank that did not compete in a meaningful way with FNB Sioux Falls' banking area. That criticism does not apply to the control, First Bank & Trust, which was used in the Mantis survey. The Court, however, as it expressed during the trial, is concerned with a control utilized in

26

Dr. Rappeport's survey because it included the term "First National," the mark which is allegedly infringed, and such control would increase survey noise and artificially diminish the level of confusion.

Defendants are also critical of the universe utilized in the Mantis Survey because it included consumers of retail and consumer banking activities as opposed to "very sophisticated commercial customers and prospective commercial customers." However, Defendants' expert, Dr. Rappeport, in his survey, did not select the universe Defendants advocate as necessary. Rappeport's study states:

> In a study such as this, we understand an appropriate universe to be people who are likely to be actual or potential purchasers and/or users of the product at issue. For a "product" in as wide-spread use as "banking services," there are two ways to operationalize such a universe. One way, which we elected to use, is to say that regardless of current behavior, over a reasonable future time period, essentially every adult living in Sioux Fall is a potential user. . . . Accordingly, we defined the universe for this study as people who currently are or are likely to use the services offered by a bank in Sioux Falls, namely, men and women 21 years old or older who live within ten miles of downtown Sioux Falls.

Ex. 552, p.6.

As was stated earlier in this memorandum opinion, the advertisements of Defendants were presented to potential consumers of retail and consumer banking activities, such consumers were being serviced at FNB South Dakota, and FNB South Dakota's strategy was to evolve into a full service bank. FNB South Dakota offered consumer services from the beginning. Its advertising was substantial and it appeared to be directed at consumers rather than commercial entities. Further, Defendants' witnesses acknowledged that those consumer deposits and CDs are necessary to generate funds for commercial lending. In consideration of the record in this case, the Court finds that the universe utilized in the Mantis Survey was acceptable.

The closer a survey method mirrors the situation in which an ordinary consumer would encounter the trademark, the greater the weight that should be given the survey results. *See* 6 J. THOMAS MCCARTHY,§32:163. The Mantis survey, which employed bank advertisements, more closely resembled the market conditions at issue than did the methodology of displaying a series of cards as was utilized in Dr. Rappeport's survey. Although neither of these surveys is without flaw, the Mantis and to a lesser degree the Rappeport survey are considered by this Court to present

circumstantial evidence of actual confusion between FNB Sioux Falls and FNB South Dakota.

The Mantis survey presented by FNB Sioux Falls resulted in a reported measure of confusion of 19%. Dr. Rappeport's survey, presented by Defendants, resulted in a reported measure of confusion of 13%,which Dr. Rappeport concluded was not significant evidence of likelihood of trademark confusion. However, in a case in which the Eighth Circuit upheld the denial of a request to modify injunctive relief, in which the survey evidence produced a range of confusion from 11% to 49%, the Eighth Circuit stated, "The lower figure itself is not an insignificant percentage." *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969); *see also, Mutual of Omaha Insur. Co. v. Novak*, 836 F.2d at 400 (finding of actual confusion upheld when survey evidence showed 10 % confusion).Viewed against the background of the other evidence, the Court finds the survey evidence supports a finding of actual confusion and the likelihood of confusion. Although the vast majority of the evidence regarding actual confusion deals with confusion between FNB Sioux Falls and FNB South Dakota, and not the other defendants, given the defendants' relationship with each other and their shared critical characteristic of emphasizing "First National Bank" in identifying themselves in advertising and other printed material, the evidence of actual confusion favors FNB Sioux Falls with regard to all of the defendants.

After considering all of the *SqirtCo* factors in conjunction with the evidence presented at trial the Court finds a likelihood of confusion among potential consumers. FNB Sioux Falls, therefore, has proven its claim under Section 43(a), 15 U.S.C. § 1125(a), for false designation of origin and false description.[11] The Court must now determine whether to expand the permanent injunction, and if so, the scope of the expanded injunction.

## WHETHER FNB SIOUX FALLS IS ENTITLED TO EXPANDED INJUNCTIVE RELIEF AGAINST ALL OF THE DEFENDANTS?

This Court has the power to modify a permanent injunction in adaptation to changed conditions. See *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d at 812. In the earlier

---

[11]In determining whether FNB Sioux Falls proved its Lanham Act claim, this Court did not consider the Deposit Market Share Report which Defendants correctly contend was not properly presented to this Court as an attachment to FNB Sioux Falls' post trial brief.

summary judgment in which this Court concluded that res judicata did not bar the present action,[12] this Court found as it now continues to find that the Defendants' changes of location, advertising and promotional activities were substantial changes.

In determining whether to expand the injunctive relief that was ordered in 1997 and upheld by the Eighth Circuit, this Court will abide by the standard for a permanent injunction and consider the following factors: (1) Plaintiff's success on the merits; (2) The threat of irreparable harm to the movant; (3) The balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) Whether the issuance of an injunction is in the public interest. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12 (1987).

FNB Sioux Falls has succeeded on its Lanham Act claims with regard to all of the Defendants in reference to their activities in Minnehaha and that part of Lincoln County which is within the eighteen-mile radius of FNB Sioux Falls' main office. It is unnecessary for the Court to address the other causes of action set forth in the Second Amended Complaint. *See Heaton Dist. Co. v. Union Tank Car Co.*, 387 F.2d 477 (8th Cir. 1967)(Trademark infringement is a part of the broader law of unfair competition, and the facts supporting a suit for infringement and one for unfair competition are substantially identical). FNB Sioux Falls has also demonstrated the threat of irreparable harm to its reputation, good will and business if the injunctive relief in effect since 1997 is not expanded to address the changes in Defendants' location, advertising and promotional activities.

With regard to the balance between the threat of irreparable harm to FNB Sioux Falls and the injury that granting an expanded injunction will inflict on other interested parties, the hardships balance in favor of FNB Sioux Falls which has, at the least, suffered inconvenience and has had compromised some of the good will and reputation it has built up over the years. This Court believes, however, it can address that balance with injunctive relief without following the all or nothing approach advanced by FNB Sioux Falls in its position that Defendants must undergo a complete name change. Given the advertising and other expenses involved in the development and use of

---

[12] "In trademark cases, res judicata must be carefully applied, since the facts of trademark usage and consumer recognition may have changed since the prior judgment was rendered." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:88 (4th Ed. 2007).

Defendants' names, as well as the legitimate prior use of their names in areas outside of Minnehaha and Lincoln Counties, this Court does not deem an order to change Defendants' name appropriate in this case.

The public interest is the final factor to be considered in determining whether to issue a permanent injunction. In a trademark case, the courts have defined the public interest as the right of the public not to be deceived or confused. *Sturgis Area Chamber of Commerce v. Sturgis Rally & Races Inc.* 99 F.Supp.2d 1090, 55 U.S.P.Q.2d 1077, 1086(D.S.D. 2000). In this case the Court finds that the public interest will be served by an injunction which attempts tp eliminate or at least diminish confusion as to the affiliation, connection, or association between FNB Sioux Falls and the Defendants. Although Defendants have taken some steps prior to and during the pendency of this action, such as replacing the copper or metallic lettering on the bank building with green lettering, the emphasis on "First National Bank" in advertising and branding and the instructions for the same, and the entire history of this matter supports a finding of a substantial possibility that the infringing conduct may be repeated. *See* MCCARTHY at §30:11; *Heaton Dist. Co. v. Union Tank Car Co.*, 387 F.2d at 486 (although dealer had discontinued unauthorized use of trademark it appeared that dealer's intentions were in doubt, so entry of permanent injunction was proper). The intention is unclear on changing from a metallic to a green appearance in the lettering. The change might have been to better conform to Defendants' system-wide branding or it might have been to reduce the similarity to Plaintiff's branding or a combination of these reasons. Being a large and respected financial organization does not excuse zealous salespersons or branding practices that allowed and caused violations of a permanent and specific injunction over what was a ten-mile radius. All of the relevant factors favor a modification and expansion of the permanent injunction which is now in place.

In modifying the existing permanent injunction and determining the proper scope of the modified injunction, the Court must consider: 1. The manner in which the plaintiff is harmed; 2. The possible means by which the harm can be avoided; 3. The viability of the defenses raised; 4. The burden that will be placed upon the defendants; and 5. The potential effect upon lawful competition between the parties. *See* MCCARTHY at §30:3 (citing RESTATEMENT THIRD, UNFAIR COMPETITION § 35, comment c (1995)). In addition, "'a party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party,'" and "'a court can frame an

30

injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,317 F.3d 209, 220 (2d Cir. 2003)(quoting *Oral-B Laboratories, Inc. v. Mi-Lor Corp.*, 810 F.2d 20, 24 (2d Cir.1987)(abrogation recognized on other grounds), and 5 McCarthy,§ 30:4)). The Court is ordering permanent injunctive relief which takes into consideration the above factors and principles. Although the Court is awarding costs to FNB Sioux Falls, the Court does not find this to be an exceptional case justifying the award of attorney fees under 15 U.S.C. § 1117(a). Accordingly,

IT IS HEREBY ORDERED:

1. That Defendants, their affiliates, successors and assigns are permanently enjoined from using the service marks "First National," "First National Bank," and "The First National Bank in Sioux Falls," in Minnehaha County and that part of Lincoln County which is within the eighteen-mile radius of FNB Sioux Falls' main office;

2. That although Defendants, their affiliates, successors and assigns may use their full names in Minnehaha and Lincoln Counties, their full names shall appear as one unit on the same line and in the same size and style of type, and "South Dakota" shall not be abbreviated;

3. That for one year from the date of this Order in all print and radio advertising that originates or is primarily targeted at either Minnehaha or that part of Lincoln County which is within the eighteen-mile radius of FNB Sioux Falls' main office, the Defendants shall present a disclaimer that the Defendant which is advertising is not affiliated with The First National Bank in Sioux Falls;

4.That FNB Sioux Falls is entitled to recover costs under 28 U.S.C. § 1920 in an amount to be determined and hereinafter inserted in the Judgment by the Clerk; and

5. That this Court's permanent injunction entered in 1997 is modified as set forth in this Memorandum Opinion and Order .

Dated this ____ day of September, 2009.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: _____
    (SEAL)        DEPUTY

31